[Cite as *In re Adoption of M.G.B.-E.*, 2016-Ohio-7912.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY

|  |  |  |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: | : |  |
| M.G.B.-E., et al. | : | CASE NO. CA2016-06-017 |
|  | : | **O P I N I O N**<br>11/28/2016 |
|  | : |  |
|  | : |  |

APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
PROBATE DIVISION
Case Nos. 20155012 and 20155013

Jason Showen, 324 East Warren Street, Lebanon, Ohio 45036, for appellee, D.E.

Rion, Rion & Rion, L.P.A., Inc., Jon Paul Rion, Nicole Rutter-Hirth, 130 West Second Street, Suite 2150, Dayton, Ohio 45402, for appellant, D.H.

**HENDRICKSON, J.**

{¶ 1} Appellant, the biological father of M.G.B-E. and R.S.B.-E., appeals the decision of the Clinton County Court of Common Pleas, Probate Division, finding that his consent was not required for the adoption of M.G.B.-E. and R.S.B.-E. by their stepfather. For the reasons stated below, we affirm the probate court's decision.

{¶ 2} V.B.-E. ("Mother") and D.H. ("Father") divorced in November 2004, in the Montgomery County Court of Common Pleas, Domestic Relations Division. Mother was given

custody of their son, R.S.B-E. (born January 4, 2000), and daughter, M.G.B.-E. (born February 12, 2003), and Father was awarded visitation. At the time of the divorce, Mother resided in Hillsboro, Ohio, and Father resided in Dayton, Ohio.

{¶ 3} Almost immediately after the parties' divorce, Mother stopped allowing Father regular visitation with the children. Between 2004 and 2006, Mother refused to exchange the children for Father's visitation on approximately 28 occasions. During this time Mother made allegations to Highland County Children Services, Montgomery County Children Services, and the Warren County Sheriff's Office that Father and various members of his family, including Father's three brothers and his mother, were sexually abusing the children.[1] Finally, in June 2006, Mother stopped allowing Father visitation altogether, claiming that the children had returned from a recent visitation with "physical signs of sexual abuse" and made statements about "what [Father] and other members of his family had participated in and what they had done to them." Then, in September 2006, Mother obtained an ex parte civil protection order from the Highland County Court of Common Pleas, which prohibited Father from having contact with Mother or the children until the order was dismissed by agreement of the parties in March 2007.

{¶ 4} Father denied abusing the children and, as a result of Mother's refusal to allow him to exercise his parenting time, Father filed numerous motions in the Montgomery County Domestic Relations Court from 2006 to 2007. Among these were motions to have Mother found in contempt, for temporary custody of the children, for the children and Father to be interviewed and examined by a psychologist, and for an in camera interview of the children. Mother also filed motions with the

---

1. In October 2006, Highland County Children Services substantiated the abuse allegations. In a letter dated October 31, 2006, the children services agency stated that "[t]he expressed concern was substantiated. * * * It is recommended that the * * * children have no further unsupervised contact with [Father]." There is no evidence that any other county substantiated the abuse allegations or that any charges were brought against Father or any of his family members.

- 2 -

domestic relations court during this time, including a motion for supervised parenting time. The parties' motions were heard by the domestic relations court in March 2007.[2]

{¶ 5} While the motions remained pending in the Montgomery County Domestic Relations Court, Mother filed an application in the Highland County Probate Court to have the children's last names changed from Father's last name to her maiden name. In the July 30, 2007 applications for change of name, Mother stated that "Father has had no contact with [the] children in over 13 months" and that the address of Father was "unknown" and "cannot with reasonable diligence be ascertained." Mother did not utilize the Dayton address contained on Father's filings in the Montgomery County Domestic Relations case to personally serve Father with the applications. Rather, service by publication was completed when Mother had notice of the applications published in the Times Gazette, "a newspaper printed and published in and of a general circulation, throughout Highland County." Mother was successful in getting the children's last names changed.

{¶ 6} On September 12, 2007, the Montgomery County Domestic Relations Court released its "Decision and Permanent Order" in which it noted that the children and parents had been evaluated by a psychologist and the court had interviewed the children. The court stated that it was unclear from its interview with R.S.B-E. "whether actual incidents of sexual abuse occurred by the [Father] and his family members. [The child] remembered some incidents that led one to believe that sexual abuse may have occurred however, when asked about things he should have known about his life, his address or grades he did not remember." The court noted the psychologist's concern that R.S.B.-E. might have been "coached" and stated that Mother "is the only one who appears to be able to describe the

---

2. Although the parties filed a number of motions in the Montgomery County Domestic Relations Court, they agreed that the only issues to be heard at the March 2007 hearing were Father's September 12, 2006 motion for contempt, Mother's motion for supervised parenting time, and Mother's motion for an in camera interview.

sexual abuse and the children for whatever reason do not communicate it to any one [sic] other than the [Mother], when questioned." The court, however, found that "because of the nature of the accusations it was appropriate for the [Mother] to proceed with caution." The court denied Father's contempt motion and granted in part Mother's motion for supervised parenting time. The court stated, "[g]iven the serious but unsubstantiated accusations of abuse, the [Father's] parenting time should occur after the parents and children are in therapy to help the children to transition to spending time with the [Father]." The court therefore ordered the following:

> The [Father's] parenting time shall be limited pending therapy for the parents and children to help the transition to spending time with the [Father]. The therapist shall set time frames for parenting time. The parties are ordered to use Dr. Michael Farrell; Dr. Kathryn Burch; Dr. Richard Genardi or a mutually agreed upon therapist. The cost shall be paid by the [Father].

{¶ 7} On April 21, 2008, the parties appeared before the Montgomery County Domestic Relations Court for a scheduled review hearing of the court's September 12, 2007 order regarding parenting time. At this time, the parties had not engaged a counselor. On April 23, 2008, the domestic relations court issued an "Agreed Order" stating that the "parties shall contact one of the three therapists to set up counseling" or "a mutually agreed upon therapist." The three counselors listed were, once again, Dr. Farrell, Dr. Burch, and Dr. Genardi.

{¶ 8} The parties again failed to set up counseling. On September 30, 2008, the domestic relations court dismissed the matter for want of prosecution. Father did not file any motions seeking parenting time or any motions related to the children following the dismissal until May 14, 2015. At this time, Father filed a "Motion to Re-Establish Parenting Time" with the Montgomery County Domestic Relations Court.

{¶ 9} Four days later, on May 18, 2015, D.E. ("Stepfather"), Mother's husband, filed petitions in the Clinton County Probate Court to adopt R.S.B.-E. and M.G.B.-E. Stepfather contended that Father's consent to the adoptions was not necessary as Father had "failed without justifiable cause to

- 4 -

provide more than de minimis contact with the minor [children] for a period of at least one year immediately preceding the filing of the adoption petition[s] or placement of the minor [children] in the home of the petitioner."[3]

{¶ 10}  On March 10 and 11, 2016, the probate court held a hearing on whether Father's consent to the adoptions was required.  At the hearing, the court heard testimony from Mother, Stepfather, Father, Father's current wife, S.H. ("Stepmother"), Father's former wife, A.M., one of Father's uncles, Father's and Stepmother's babysitter, and three officers from the Wilmington Police Department.  The court also took into evidence a number of exhibits, including filings from the Montgomery County Domestic Relations case and the Highland County probate case, police incident reports filed with the Wilmington Police Department between 2004 and 2015, and pictures of the children.

{¶ 11}  At the consent hearing, Mother and Stepfather testified about Father's lack of involvement in the children's lives.  Mother discussed the abuse allegations and her reasons for not allowing Father to visit with the children after the divorce.  Mother explained that Father has not had parenting time with the children since June 2006, and further testified that there has been "no contact" between Father and the children since that time.  Mother stated Father never contacted her about any therapy sessions after the Montgomery County Domestic Relations Court issued its September 12, 2007 and April 23, 2008 orders.

{¶ 12}  Between the time the Montgomery County Domestic Relations case was dismissed in September 2008 and the petitions for adoption were filed on May 18, 2015, Mother stated she has not received any voicemails, phone calls, text messages, emails, cards, letters, or gifts from Father for the children.  Mother explained she resided at the same address in Hillsboro, Ohio from the time of her divorce until January 2010.  During this time, the children attended Hillsboro schools.  Then, in

3. Stepfather did not claim in his petitions for adoption that Father failed to provide maintenance or support to

January 2010, Mother moved to a home on Austin Drive in Cincinnati, Ohio. Mother lived at this residence for approximately one year before moving a "couple miles down the street." During this time, the children attended West Clermont schools. Mother stayed in this home until mid-2013, when she married Stepfather and moved to Locust Street in Wilmington, Ohio. Mother admitted she did not notify Father or the Montgomery County Domestic Relations Court of her various moves throughout the years, even though the divorce decree required the parties to "give written notice to the other parent immediately upon any change of address and/or phone number * * * [and to provide a] copy of the notice * * * to the Domestic Relations Court."

{¶ 13} Mother had a variety of jobs during this time period. Mother's move to Cincinnati was driven by her new job in music ministry with the Solid Rock Church, South Campus. While working for the Solid Rock Church, Mother also worked at a local college as an assistant director of admissions and then at an automotive marketing company. Mother now works in advertising for a newspaper company. Mother testified that her phone number often changed when her employment changed. Since her divorce from Father, Mother's phone number has changed three or four times. Mother testified she did not provide Father or the Montgomery County Domestic Relations Court with notice of her new phone numbers.

{¶ 14} Mother explained that although her address and phone number had changed since the time of her divorce from Father, she still used the same email account she had while dating and married to Father. Mother testified Father knew of this email because he had sent her emails at this address while they were in a relationship together. However, after the divorce, Father never contacted Mother at this email to communicate with the children or to ask for parenting time. Father also did not attempt to contact Mother or the children by reaching out to Mother's parents. Mother testified that her parents live in Hillsboro, Ohio at the same residence they lived in when she and Father were married.

the children.

According to Mother, her parents also have the same phone number they had when Mother and Father were married. To Mother's knowledge, Father never contacted her parents to obtain contact information for her or the children.

{¶ 15} Mother also suggested that Father could have located her through "mutual acquaintances" from the Solid Rock Church. Mother testified she and Father met at Solid Rock in 1998. At that time, Father was a member of the church's choir. After she and Father divorced, Mother maintained a "front and center" role with the church and "anybody" knew that she lived near the church's property while she was employed in the church's music ministry program.

{¶ 16} Mother testified that on July 4, 2010, she saw Father from a distance while attending a picnic at the Solid Rock Church, North Campus, in Monroe, Ohio. Mother explained Father did not approach her or either of the children at this picnic. Mother expressly denied taking steps to prevent Father from seeing or speaking with the children on this occasion.

{¶ 17} Following the June 4, 2010 picnic, Mother did not see or hear from Father until April 2015. On April 28, 2015, Mother and Stepfather were attending a track meet at Wilmington High School to watch R.S.B.-E. compete when Mother noticed Father in attendance. Father's presence scared Mother "to death" and she contacted the police. Mother admitted Father had not taken any threatening actions towards her or R.S.B.-E., but she still felt the need to contact the police given that she did not know "what his intentions were" and his "history of sexual abuse" with the children. Mother explained that an officer from the Wilmington Police Department arrived at the track meet and spoke with Father. The officer did not make Father leave the meet. Father did not speak with R.S.B.-E. at this meet, and Mother denied that she or Stepfather took any actions to prevent R.S.B.-E. from having contact with Father.

{¶ 18} On April 30, 2015, Father went to another one of R.S.B.-E.'s track meets at Little Miami High School. After noticing Father at this event, Mother spoke with the athletic director at

R.S.B.-E.'s school to inform him "of the situation" with Father. Mother stated that Father did not approach her to discuss parenting time at this meet. She denied that she or anyone else prohibited Father from having contact with R.S.B.-E. at this track meet.

{¶ 19} On May 5, 2015, Mother, Stepfather, and Mother's father all attended a track meet even though R.S.B.-E. was not present or competing at the meet. Mother stated she was present because she had to work the concession stand. Mother denied pulling R.S.B.-E. from the track meet as a way of ensuring that Father could not have contact with R.S.B.-E.

{¶ 20} Mother testified that after Father became aware that the children went to school in Wilmington, Father did not send any cards, letters, emails, or any other form of communication to the children. Mother stated she, R.S.B.-E., and M.G.B.-E. are active on social media. Mother has a Facebook account and Instagram account. R.S.B.-E. and M.G.B.-E. have Instagram and Snapchat accounts. Father never contacted her or the children through social media.

{¶ 21} Stepfather testified he and Mother were married in January 2013, and they, along with R.S.B.-E. and M.G.B.-E., have resided on Locust Street in Wilmington, Ohio since May or June 2013. Stepfather explained that neither Mother nor the children have received any correspondence from Father in the time that he has been involved in their lives. The first time Stepfather saw Father in person was at the April 28, 2015 track meet. Stepfather denied doing anything to prevent Father or Father's family members from communicating with R.S.B.-E. at the track meets. Stepfather stated that at the April 30, 2015 track meet, he stayed about "40 feet or so" away from Father when they both stood near the finish line for R.S.B.-E.'s race. When R.S.B.-E. finished, Stepfather "ran out and congratulated" R.S.B.-E. on running "his fastest time ever." Stepfather denied that his actions were intended to prevent Father from having contact with R.S.B.-E.

{¶ 22} Stepfather testified about an incident that occurred on May 14, 2015. Stepfather claims that on this date, Father and "five or six" people had showed up at his house, which prompted him to

call 9-1-1. Stepfather told the dispatcher he had "grabbed [R.S.B.-E.] out the back door" and left the property to head to a nearby bank. Stepfather informed the dispatcher Father had been "showing up at track meets and trying to intimidate me." Stepfather described two vehicles that he believed contained Father and others who were trying to intimidate him. Police officers were dispatched, and they located a process server in one of the vehicles described by Stepfather. The process server had attempted to serve Father's "Motion to Re-establish Parenting Time" on Mother at the Locust Street residence. On cross-examination, Stepfather admitted Father had "never c[o]me to [his] front door."

{¶ 23} Following Mother's and Stepfather's testimony, Father presented testimony from a number of witnesses who painted an entirely different picture of Father's involvement, or his attempt at involvement, in the children's lives. Father's uncle testified about difficulties Father had in exercising his visitation with the children in 2004. Uncle testified he accompanied Father to the place where the children were to be exchanged on at least three occasions in 2004, and on each occasion Mother failed to show up with the children. Father's former wife, A.M., also testified about the difficulties Father had in communicating with Mother from 2004 to 2006, and in exchanging the children during this time frame. A.M. explained that after she married Father in November 2004, she attempted to communicate with Mother to arrange visitations. A.M. attempted to contact Mother on her cell phone or at Mother's parent's house, but her calls were often ignored by Mother. A.M. also went with Father to parenting exchanges "[e]very other weekend" from 2004 to 2006, but Mother only allowed the exchanges to happen "a few times" during that time period.

{¶ 24} Father testified about problems he has had in exercising his parenting time with the children. He explained he has always had a strained relationship with Mother's parents, as they objected to her marrying him. After Father and Mother separated, Father's relationship with his in-laws and with various members of the Solid Rock church deteriorated. Father began to have difficulty seeing his children, as others would try to interfere with his visitations. Then, after the divorce was finalized,

Mother started refusing to allow Father his parenting time altogether. Father explained the abuse allegations Mother levied against him and his family members, and stated that no charges have ever been brought against him or his family member's as a result of the allegations.

{¶ 25} Father stated that from the time of the divorce until 2006, he regularly appeared at the exchange location for his visitation with the children. Even though Mother refused to allow the visitations, he attempted to maintain contact with the children by mailing cards to the children at Mother's Hillsboro address in 2005 and 2006. He also fought to exercise his visitations by filing motions in the Montgomery County Domestic Relations Court during this time. Father testified that after the Montgomery County Domestic Relations Court issued its September 12, 2007 order, he contacted the three therapists listed in the order but "these therapists were not the type of therapists that were needed for our situation." Father admitted he did not have any proof that he contacted the therapists listed in the court's order. He further admitted that things "fell through the cracks" when it came to arranging the therapy appointments.

{¶ 26} Father testified that "[t]here's no other means I could have taken or done. I exhausted every measure I possibly could" in trying to have contact with the children. He explained that after 2006, he no longer had a working phone number for Mother. Mother never provided him with notice after she changed her phone number or after she changed residences. Father stated he tried to look for the children after Mother changed residences. He searched online and "[t]hrough people from church, people from where she used to work, any ways [sic] and means possible." Father denied knowing Mother's email address, claiming that if he had known Mother's email, he would have contacted her in this manner. He explained that after he heard of "sightings" of his children, he went to Solid Rock Church to investigate. He saw R.S.B.-E. at the July 4, 2010 picnic at Solid Rock Church, but before he could approach R.S.B.-E. and talk to him, R.S.B.-E. was "hauled away" by Mother.

{¶ 27} Father also testified that he had no knowledge that the children's last names had been

changed. Father was never notified by Mother or Mother's attorney of the proceedings in the Highland County Probate Court.

{¶ 28} Father did not know where the children were living until Stepmother and their babysitter ran into R.S.B.-E. and M.G.B.-E. at the Little Miami versus Wilmington High School football game on August 29, 2014. After this game, Father stated he asked a friend in the Central Intelligence Agency ("C.I.A.") to help him track down Mother and the children. After learning that the children attended school in Wilmington, Father started attending R.S.B.-E.'s sporting functions. Father went to one of R.S.B.-E.'s wrestling meets in the winter of 2014, but he did not approach R.S.B.-E. at this meet to talk with him.

{¶ 29} Father also began attending R.S.B.-E's track meets. Father explained that at the April 28, 2015 track meet, Mother called the police after spotting Father in the stands. Father stated he was permitted to remain at the track meet, but was "ordered" by a Wilmington police officer not to have contact with Mother or R.S.B.-E.

{¶ 30} Father then attended the April 30, 2015 track meet. At this meet, Father stood approximately eight feet away from where R.S.B.-E. lined up to start his race. At this time, Father stated to R.S.B.-E., "I'm your father, I'm here for you. * * * I'm here for you, and you're going to do well. I'm just here to watch you. If you need anything, your daddy's here." Father then watched R.S.B.-E. race. After the race concluded, Father claimed he was unable to talk with R.S.B.-E. because Stepfather removed R.S.B.-E. from the field and hid him behind a food trailer.

{¶ 31} Father was present at Wilmington's May 5, 2015 and May 14, 2015 track meets, but he did not see R.S.B.-E. at these events. Father testified that after leaving the May 14, 2015 meet with Stepmother, he and Stepmother followed a process server to Mother's home. Father stated he parked his vehicle about "two blocks" away from Mother's house and, from inside the vehicle, watched as the process server attempted to serve his "Motion to Re-Establish Parenting Time."

**{¶ 32}** On cross-examination, Father admitted he has not seen M.G.B.-E. since June 2006, as she was not present at any of R.S.B.-E.'s sporting events. He acknowledged that he has not had visitation or exchanged phone calls, letters, cards, emails, or text messages with either child since 2006. He also acknowledged that from September 2008 until May 14, 2015, he had not filed any motions seeking parenting time in the Montgomery County Domestic Relations Court. Finally, Father admitted to moving three times since the divorce. He believed his counsel "probably" filed a notice of intent to relocate with the Montgomery County Domestic Relations Court, but "d[id] not know" for sure whether such notices had been filed.

**{¶ 33}** Stepmother testified she began dating Father in 2009, and they were married in 2011. They have five children together. Stepmother stated that when she and Father first started dating, she helped Father search for R.S.B.-E. and M.G.B.-E. online. From 2009 through 2012, Stepmother searched for R.S.B.-E. and M.G.B.-E. by means of google, Facebook, and Myspace. Stepmother was with Father at the July 4, 2010 picnic at Solid Rock Church when Father spotted R.S.B.-E. in the crowd. Stepmother explained that before she and Father could approach R.S.B.-E., he was lost in a crowd.

**{¶ 34}** On August 29, 2014, Stepmother attended the Little Miami versus Wilmington High School football game to watch her and Father's babysitter cheerlead. While at the game, Stepmother stated she saw R.S.B.-E. and M.G.B.-E. near a concession stand. She observed her babysitter talking to R.S.B.-E. while she waited in the concession-stand line near M.G.B.-E. Stepmother did not identify herself as Father's wife to either R.S.B.-E. or M.G.B.-E. Stepmother explained that she did not want to "say anything that would tip her off so that, you know, [Mother] would find out and then move the kids or hide the kids and we wouldn't be able to find them again."

**{¶ 35}** After discovering the children at the football game, Stepmother started searching online for Mother in the Wilmington area and she found Mother on Facebook. Stepmother started attending

R.S.B.-E.'s sporting events with Father. They went to one of R.S.B.-E.'s wrestling meets. According to Stepmother, Father did not approach R.S.B.-E. at this meet because Father and Stepmother "weren't financially ready to get the lawyers involved yet. * * * We just didn't want them to know that we knew where they were until the lawyers - - we could already file. * * * [We wanted] to be really careful about how we move[d] so that they were able to be served before they disappeared again."

{¶ 36} Stepmother also started attending R.S.B.-E.'s track meets with Father. At the April 28, 2015 meet, Mother saw Father in attendance and called the police. The officer who spoke with Father told Father that he could stay at the meet but he could not have contact with R.S.B.-E. or Mother. At the April 30, 2015 track meet, Stepmother and Father were able to watch R.S.B.-E. compete, but in between his races, R.S.B.-E. was kept near a food trailer so that people could not approach him. According to Stepmother, other athletes were not kept near this trailer. After R.S.B.-E. completed his last race, Stepfather immediately "took [R.S.B.-E.] off the field" and Father was not given the opportunity to communicate with R.S.B.-E.

{¶ 37} Stepmother testified she attended Wilmington's May 5, 2015 and May 14, 2015 track meets, but R.S.B.-E. was not in attendance on those days. After leaving the track meet on May 14, 2015, Stepmother and Father followed a process server towards Mother's home. According to Stepmother, she and Father parked about "two blocks" away from Mother's and Stepfather's house and waited in their vehicle while the process server attempted to serve Father's "Motion to Re-Establish Parenting Time."

{¶ 38} Father's and Stepmother's babysitter also testified at the hearing. The babysitter explained that she began watching Father's and Stepmother's five young children in 2014. On August 29, 2014, the babysitter was cheerleading at the Little Miami versus Wilmington high school football game. During halftime of the game, the babysitter saw R.S.B.-E. near the concession stands. She recognized R.S.B.-E. from pictures she had previously seen. She spoke with R.S.B.-E. and found out

he would be wrestling for Wilmington High School. The babysitter did not mention Father or convey any messages to R.S.B.-E. from Father at the football game. Then, in the winter of 2014, the babysitter accompanied Father, Stepmother, and their children to a Wilmington wrestling meet. The babysitter was able to speak to R.S.B.-E. at the wrestling meet. She did not convey any messages to R.S.B.-E. from Father. R.S.B.-E. informed the babysitter that he would be running track in the spring. The babysitter and R.S.B.-E. began to follow each other on Instagram.

{¶ 39} Father also called officers from the Wilmington Police Department to testify about the events that took place at the April 28, 2015 track meet and the events that occurred on May 14, 2015, when Stepfather called 9-1-1. An officer testified that upon arriving at the April 28, 2015 track meet, he spoke separately with Mother and Father. Mother informed the officer that "her ex-husband was at the track meet, and she did not feel that he was allowed to be there. And she hadn't seen him in a number of years. * * * She wanted him to leave." The officer than spoke with Father, who informed the officer that he was at the meet to watch his son compete. The officer did not instruct Father to leave but "requested he [have] no contact with [Mother] or their child."

{¶ 40} Two other officers testified about being dispatched to Stepfather's residence on May 14, 2015. One officer explained that while in route to Stepfather's home, he encountered one of the vehicles Stepfather had described in his 9-1-1 call. After stopping the vehicle, he discovered the driver was a process server. The officer directed the process server to the bank where Stepfather and the second officer were waiting. Neither the officer who first encountered the process server or the other officer who waited with Stepfather at the bank observed any other individuals traveling with the process server.

{¶ 41} After considering the foregoing testimony and evidence, the probate court issued its decision on May 19, 2016, finding that Father's consent was not required for the adoption. In issuing its decision, the court noted that it found Stepfather and Stepmother "to be very credible, honest, and

with good memory.  Some [other] witnesses * * * the Court did not find to be very credible."  The

court found by clear and convincing evidence that Father had, without justifiable cause, failed to

communicate with R.S.B.-E. and M.G.B-E. for one year prior to the filing of the adoption petition.

Specifically, the court noted that Father had not had any contact with M.G.B.-E. for "several years" and

that Father's contact with R.S.B.-E was "less than de minimis contact" as it included only "two or three

or so athletic events where the [F]ather did see the son, however only one event did the son see him."

The court also stated:

> [T]he lack of contact was without justifiable cause to provide more than "de minimis contact."  The Court put a lot of weight in the fact that the [F]ather "dropped the ball" on the final "order" out of Montgomery County, and did not provide or pay for or pursue counseling for the family to reinstate visitation of the minor children herein.  The [F]ather's actions continued for years (or lack thereof) until he married the current wife.  The Court is not totally convinced his heart is in it today but not for the new wife.
>
> The Court orders the adoption to proceed for both minor children by the [S]tepdad and the consent by the natural father is not necessary under Ohio law for lack of any meaningful contact for a year or more prior to the filing of the Petition[s] for Adoption.

**{¶ 42}**  Father timely appealed the probate court's opinion, raising three assignments or error.

As Father's second and third assignments of error are related, we will address them together.

**{¶ 43}**  Assignment of Error No. 1:

**{¶ 44}**  THE TRIAL COURT LACKED JURISDICTION TO PROCEED WITH A HEARING

ON WHETHER FATHER'S CONSENT TO THE ADOPTION WAS REQUIRED BY FATHER, AS

FATHER HAD A PENDING MATTER REGARDING THESE CHILDREN IN ANOTHER COURT.

**{¶ 45}**  In his first assignment of error, Father argues the probate court "lacked jurisdiction to

proceed with the adoption proceeding" because his "Motion to Re-establish Parenting Time" was

pending in the Montgomery County Domestic Relations Court.  Father contends that because his

motion was filed prior to Stepfather filing the petitions for adoption, the probate court was required to

"refrain from exercising jurisdiction" over the petitions for adoption until his motion was resolved.  In support of his argument, Father relies on the Ohio Supreme Court's holdings in *In re Adoption of Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572; *In re Adoption of G.V.*, 126 Ohio St.3d 249, 2010-Ohio-3349; and *In re Adoption of P.A.C.*, 126 Ohio St.3d 236, 2010-Ohio-3351.

{¶ 46}  In the three cases relied upon by Father, petitions were filed to adopt minor children prior to paternity of the minor children being established.  The supreme court held that "[w]hen an issue concerning parenting of a minor is pending in the juvenile court, a probate court must refrain from proceeding with the adoption of that child." *Pushcar* at syllabus; *In re G.V.* at ¶ 8; *In re P.A.C.* at ¶ 8.[4]  However, the supreme court clarified that "*Pushcar* required the probate court to refrain from proceeding while there was a question of *parentage* — i.e., paternity — pending in the juvenile court." (Emphasis sic.)  *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Probate Div.*, Slip Opinion No. 2016-Ohio-7382, ¶ 38, citing *In re G.T.B.*, 128 Ohio St.3d 502, 2011-Ohio-1789, ¶ 10 and fn. 2.  *Pushcar* "did not hold that the probate court lacked jurisdiction" but rather indicated that "the probate court could not proceed with the adoption without the consent of the putative father, and only the juvenile court could decide the question of the child's paternity." *Id.* at ¶ 37.

{¶ 47}  The fact that there is another proceeding in a court with continuing jurisdiction over a child does not divest a probate court of its exclusive, original jurisdiction over adoption proceedings. *See, e.g., id.* at ¶ 40; *In re Adoption of Biddle*, 168 Ohio St. 209 (1958), paragraph two of the syllabus; *In re Adoption of McDermitt*, 63 Ohio St.2d 301, 308 (1980).  The supreme court has found that "[a] Probate Court has jurisdiction to hear and determine an adoption proceeding relating to a minor child notwithstanding the fact that the custody of such child is at the time within the continuing jurisdiction

---

4. In *In re Adoption of G.V.*, 126 Ohio St.3d 249, 2010-Ohio-3349; and *In re Adoption of P.A.C.*, 126 Ohio St.3d 236, 2010-Ohio-3351, the Ohio Supreme Court discussed its holding in *In re Adoption of Pushcar*, 110 Ohio St.3d 662, 2006-Ohio-4572, and noted that it "did not intend our holding or analysis to be restricted to parenting

of a divorce court." *Biddle* at paragraph two of the syllabus. *See also Syversten v. Carrelli*, 67 Ohio App.2d 105, 106-107 (8th Dist.1979) (applying *Biddle* after the adoption statutes were revised); *In re Adoption of Joshua Tai T.*, 6th Dist. Ottawa No. OT-07-055, 2008-Ohio-2733, ¶ 37. Although domestic relations courts may retain continuing jurisdiction to modify orders with respect to visitation

---

issues implicated by R.C. 3107.07(A). Rather, our use of general language shows that we intended the holding to *apply to all parenting issues pending in juvenile court.*" (Emphasis added.)

rights by noncustodial parents, "such proceedings cannot and do not affect the jurisdiction of the probate court in proceedings to adopt a minor child of the parties to the divorce, since original and exclusive jurisdiction over adoption proceedings is vested specifically in the probate courts, pursuant to Chapter 3107 of the Revised Code." *In re Kreiger*, 2d Dist. Greene No. CA 1110, 1980 WL 352388, *2 (Mar. 24, 1980), citing *State ex rel. Portage Cty. Welfare Dept. vs. Summers*, 38 Ohio St.2d 144 (1974).

{¶ 48} Unlike in *Pushcar*, *In re G.V.*, and *In re P.A.C.*, there was not a question of parentage (i.e., paternity) pending in juvenile court at the time the petitions for adoption were filed. Rather, there was a motion seeking to change, or "re-establish," visitation rights filed by Father, the noncustodial parent, in domestic relations court. The fact that this motion was pending in Montgomery County Domestic Relations Court does not divest the probate court of its exclusive, original jurisdiction over Stepfather's petitions for adoption of M.G.B.-E. and R.S.B.-E. *See Kreiger* at *2. Whether Father's visitation is "re-established" has no bearing on whether he failed without justifiable cause to provide more than de minimis contact with the children in the year immediately preceding the filing of the adoption petition.

{¶ 49} Accordingly, for the reasons stated above, we find no merit to Father's argument that the probate court "lacked jurisdiction to proceed" over the petitions for adoption. Father's first assignment of error is overruled.

{¶ 50} Assignment of Error No. 2:

{¶ 51} PETITIONER FAILED TO PROVE THAT FATHER'S CONTACT WAS LESS THAN DE MINIMIS DURING THE YEAR PRECEDING THE FILING OF THE ADOPTION PETITION.

{¶ 52} Assignment of Error No. 3:

{¶ 53} PETITIONER FAILED TO ESTABLISH FATHER'S LACK OF DE MINIMIS CONTACT WAS WITHOUT JUSTIFIABLE CAUSE.

{¶ 54} In his second and third assignments of error, Father argues the probate court erred by finding his consent to adoption was unnecessary as provided in R.C. 3107.07(A). Specifically, Father claims the probate court erred when it concluded that he had "less than de minimis contact" with M.G.B.-E. and R.S.B.-E. in the year before the adoption petitions were filed and when it concluded his lack of contact was without justifiable cause.

{¶ 55} The right of natural parents to the care and custody of their children is one of the most precious and fundamental in law. *In re Adoption of C.M.F.*, 12th Dist. But. Nos. CA2013-06-090 and CA2013-06-091, 2013-Ohio-4719, ¶ 8. An adoption permanently terminates the parental rights of a natural parent. *In re Adoption of L.C.W.*, 12th Dist. Butler No. CA2014-08-169, 2015-Ohio-61, ¶ 10. Therefore, "[b]ecause adoption terminates these rights, Ohio law requires parental consent to an adoption unless a specific statutory exemption exists." *In re Adoption of A.N.B.*, 12th Dist. Preble No. CA2012-04-006, 2012-Ohio-3880, ¶ 5.

{¶ 56} R.C. 3107.07 sets forth exceptions to the general parental consent requirement. As pertinent here, pursuant to that statute, consent to an adoption is not required where

> [a] parent of a minor, when it is alleged in the adoption petition and the court, after proper service of notice and hearing, finds by clear and convincing evidence that the parent has failed without justifiable cause to provide more than de minimis contact with the minor or to provide for the maintenance and support of the minor as required by law or judicial decree for a period of at least one year immediately preceding either the filing of the adoption petition or the placement of the minor in the home of the petitioner.

R.C. 3107.07(A). Therefore, pursuant to this statute, the burden is on the petitioner to establish by clear and convincing evidence that (1) the parent has failed to provide more than de minimis contact with the child or to provide maintenance or support for the child for the requisite one-year period and (2) that the failure was without justifiable cause. *In re Adoption of M.B.*, 131 Ohio St.3d 186, 2012-

Ohio-236, ¶ 22; *In re Adoption of Holcomb*, 18 Ohio St.3d 361 (1985), paragraph four of the syllabus; *In re Adoption of J.F.M.*, 12th Dist. Butler No. CA2016-03-044, 2016-Ohio-4823, ¶ 11.[5]  Once the petitioner establishes the parent's failure, "the opposing parent must show some facially justifiable cause for such failure. * * * The burden of proof, however, remains with the petitioner." *Id.  See also In re Adoption of Bovett*, 33 Ohio St.3d 102 (1987), paragraph two of the syllabus.

**{¶ 57}**  In applying R.C. 3107.07(A), a probate court undertakes a two-step analysis.  *In re M.B.* at ¶ 23.  The first step involves deciding a factual question:  whether the petitioner has proved by clear and convincing evidence that the parent failed to have more than de minimis contact with the children or willfully failed to provide for the maintenance and support of the children.  *Id.* at ¶ 21; *In re Adoption of K.A.H.*, 10th Dist. Franklin No. 14AP-831, 2015-Ohio-1971, ¶ 7; *In re Adoption of S.M.H.*, 2d Dist. Greene No. 2013 CA 59, 2014-Ohio-45, ¶ 4.  A probate court has broad discretion over these factual determinations, and the court's judgment should not be disturbed absent an abuse of discretion. *In re M.B.* at ¶ 21 and 25; *In re K.A.H.* at ¶ 7; *In re S.M.H.* at ¶ 4.  If a probate court finds a failure to support or contact the children, the probate court's second step is to determine whether the petitioner has proven by clear and convincing evidence a lack of justifiable cause for the failure.  *Id.*; *In re K.A.H.* at ¶ 7.  The question of whether justifiable cause for the failure to support or contact the children has been proven in a particular case, "'is a determination for the probate court and will not be disturbed on appeal unless such determination is against the manifest weight of the evidence.'"  *In re M.B.* at ¶ 24, quoting *In re Adoption of Masa*, 23 Ohio St.3d 163 (1986), paragraph two of the syllabus.  *See also In re Adoption of C.A.L.*, 12th Dist. Clermont No. CA2015-01-010, 2015-Ohio-2014, ¶ 29.  "In determining whether a judgment is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility and

---

5. Clear and convincing evidence is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal

determine whether, in resolving conflicts in the evidence, 'the trier of fact clearly lost its way and created such a manifest miscarriage of justice that there must be a reversal of the judgment and an order for a new trial." *In re L.C.W.*, 2015-Ohio-61, ¶ 14, quoting *In re Adoption of E.E.R.K.*, 2d Dist. Miami No. 2013 CA 35, 2014-Ohio-1276, ¶ 18. A reviewing court must be mindful of the fact that the probate court "is in the best position to observe the demeanor of the parties and assess the credibility and accuracy of the testimony." *In re C.A.L.* at ¶ 29.

*Lack of Contact with the Children*

**{¶ 58}** In the present case, the probate court found that Father had "absolutely no contact" with M.G.B.-E for "several years" and that Father had "less than de minimis contact" with R.S.B.-E. in the year immediately preceding Stepfather's filing of the adoption petitions. We conclude that the probate court did not abuse its discretion in finding that Father had not had more than de minimis contact with the children. Clear and convincing evidence was presented that Father had not had visitation with either child since June 2006. Since June 2006, Father has not seen M.G.B.-E., had any phone conversations with her, or sent her any text messages, correspondence, or gifts. Similarly, Father had no contact whatsoever with R.S.B.-E. from June 2006 until sometime in late 2014 or early 2015, when he started attending R.S.B.-E.'s sporting events. Even then, Father's contact was less than de minimis as he merely shouted encouragement at R.S.B.-E. rather than approaching or personally speaking with R.S.B.-E. at these events.

**{¶ 59}** Father's second assignment of error is, therefore, without merit and is overruled.

*Without Justifiable Cause*

**{¶ 60}** Father contends that even if his contact with the children was less than de minimis, his lack of contact was justified given Mother's interference and "sabotage" of his relationship with the children. In support of his argument, Father points to "Mother's actions of refusing parenting time,

cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to

moving without notice, changing her phone number without notice, changing the children's name without notice, making false allegations of sexual abuse, and calling the police on Father when he show[ed] up."

{¶ 61} The supreme court has recognized that "[s]ignificant interference by a custodial parent with communication between the non-custodial parent and the child, or significant discouragement of such communication, is required to establish justifiable cause for the non-custodial parent's failure to communicate with the child." *Holcomb*, 18 Ohio St.3d at 361, paragraph three of the syllabus. Where a custodial parent's substantial efforts have "deprived the non-custodial parent of the opportunity of enjoying a meaningful relationship with his child * * * the law should not further reward [the custodial parent's] discordant efforts by countenancing a termination of the non-custodian's parental rights in a non-consensual adoption proceeding." *In re Adoption of Hupp*, 9 Ohio App.3d 128, 131 (8th Dist.1982). In examining whether a noncustodial parent's failure to have contact was justified, "[a] probate court may examine any preceding events that may have a bearing on the parent's failure to communicate with the child, and the court is not restricted to focusing solely on events occurring during the statutory one-year period." *In re Adoption of I.M.M.*, 5th Dist. Ashland No. 16 COA 018, 2016-Ohio-5891, ¶ 29, citing *In re Adoption of Lauck*, 82 Ohio App.3d 348, 353 (9th Dist.1992). *See also In re Adoption of C.J.C.*, 9th Dist. Wayne No. 15AP0040, 2016-Ohio-4909, ¶ 6.

{¶ 62} In the present case, the probate court had before it clear and convincing evidence that Father had failed to visit or have meaningful contact with the children since June 2006. Mother ended Father's visitations due to suspected sexual abuse of the children. Mother's actions in refusing Father his parenting time as well as Father's right to exercise his parenting time were issues resolved in the Montgomery County Domestic Relations Court in 2007 and 2008. As a result of that court's September 12, 2007 and April 23, 2008 orders, Father was given the opportunity to re-establish parenting time

---

be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

with M.G.B.-E. and R.S.B.-E. by setting up therapy appointments "to help the [children] transition to spending time with the [Father]." Stepfather presented uncontroverted evidence that the therapy appointments were not set up and that things "fell through the cracks." The probate court was entitled to heavily weigh the evidence that Father "dropped the ball" and "did not provide or pay for or pursue counseling for the family to reinstate visitation of the minor children" in determining that Father's lack of contact was not justified. Father's failure to comply with the domestic relations court's September 12, 2007 and April 23, 2008 orders resulted in his lack of physical contact with the children. His failure to file any motions for parenting time in the Montgomery County Domestic Relations Court between September 2008 and May 13, 2015, also contributed to his continued lack of physical contact with the children.

{¶ 63} Additionally, while Mother's actions in moving and changing her phone number without providing notice to Father or the Montgomery County Domestic Relations Court certainly complicated any efforts made to contact the children, there was ample evidence presented to support the probate court's finding that Father's lack of contact with the children resulted from Father's own choices and his "continued" lack of action over the years. Stepfather presented evidence supporting the probate court's finding that Father did not attempt to contact or locate his children "until he married the current wife." From the time of Mother's and Father's divorce in November 2004 until January 2010, Mother and the children resided in the same home in Hillsboro, Ohio. Mother testified that after June 2006, Father never contacted the children at this residence. Father admitted to the court that after 2006, he never attempted to contact the children by mailing them cards, letters, or gifts at the Hillsboro address. Father had the opportunity to maintain communication and contact with the children through correspondence at the Hillsboro address, yet he failed to do so.

{¶ 64} Further, although Mother moved and changed her phone number without providing notice to Father, Stepfather presented evidence that there were other means by which Father could have

contacted the children. There was testimony that Father knew the phone number and address of Mother's parents, yet he admitted the last time he had reached out to Mother's parents for information on the children was "a long time ago," or around 2006. Father could have sent correspondence to the children at their grandparent's residence or contacted the children's grandparents to obtain contact information for the children. Father failed to do so.

**{¶ 65}** Father also could have emailed the children at Mother's email address. Mother testified she has had the same email for a number of years and that Father knew her email as he had emailed her at this address when they were in a relationship together. Additionally, Father could have made efforts to contact the children after learning of their involvement in the Solid Rock Church. Father testified that he heard of "sightings" of his children at the church and he even saw Mother and R.S.B.-E. at the church on July 4, 2010. Despite knowing Mother was a member of the church and his children had been attending services at the church, Father did not use this knowledge to contact Mother or the children. As Mother indicated during her testimony, her employment and involvement with the church's music ministry program was widely known. According to Mother, at least three times a week she was "front and center" in leading worship or playing the piano at church services.

**{¶ 66}** Father denied that these were possible methods by which he could have contacted the children or obtained information about where the children were residing. He claimed he did not know Mother's email address and that his attempt to locate Mother and the children by asking "people from the church" was unsuccessful. The probate court, as the trier of fact, was "in the best position to observe the demeanor of the parties, to assess their credibility, and to determine the accuracy of their testimony." *Holcomb*, 18 Ohio St.3d at 367. The probate court was entitled to find Stepfather's evidence more credible than Father's evidence on these issues. The court was also entitled to find that it was Father's own lack of effort in reaching out to contact the children in these methods that resulted in his lack of contact with M.G.B.-E. and R.S.B.-E.

**{¶ 67}** It is also significant that after Father encountered the children in 2014, he did not resume contact with the children. By the end of 2014, Father's friend with the C.I.A. had verified the children and Mother were living in Wilmington, and Father knew the children attended Wilmington schools. Despite knowing where the children were living and attending classes, Father did not reach out to R.S.B.-E. or M.G.B.-E. Father did not send letters, cards, or gifts to the children's home or schools. Father did not contact the children on their social media accounts or on Mother's accounts. When encountering Mother at R.S.B.-E.'s sporting events, Father did not ask Mother for parenting time or for a valid phone number at which he could reach the children.

**{¶ 68}** Father also did not approach R.S.B.-E. at his wrestling meet or his track meets. Although a Wilmington police officer requested that Father not have contact with Mother or R.S.B.-E. at the April 28, 2015 meet, there is nothing in the record demonstrating that the police prohibited Father from speaking to his son or to Mother at later meets. Additionally, although Father claims that Mother and Stepfather prevented him from speaking to R.S.B.-E. at the April 30, 2015 meet, there was evidence to the contrary presented. The court was entitled to find Mother and Stepfather's testimony that they did not prohibit Father from contacting R.S.B.-E. at this event more credible.

**{¶ 69}** Accordingly, having thoroughly examined the record, we find that the probate court's determination that Father's lack of contact with the children was without justifiable cause was not against the manifest weight of the evidence. Stepfather presented clear and convincing evidence that, despite Father having the opportunity and ability to contact and communicate with the children, Father failed to have more than de minimis contact with R.S.B.-E. and M.G.B.-E. The probate court, therefore, did not err in concluding that Father's consent to Stepfather's adoption of R.S.B.-E. and M.G.B.-E. is not required pursuant to R.C. 3107.07(A). Father's third assignment of error is overruled.

**{¶ 70}** Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.